JANVIER, Judge.
In the accident from which this suit results three vehicles were involved, — a mo-torbus of the defendant, Continental Southern Lines, Inc., a very old Ford sedan of the defendant, Joell Turner, and a Nash sedan of the plaintiff, Harry A. Esteve.
The accident took place in New Orleans at the intersection of Tulane and Claiborne Avenues, between 4:40 and 5:00 o’clock on the morning of May 14, 1952. Both the avenues are very wide thoroughfares, Claiborne Avenue being about 200 feet in width *405 from sidewalk to sidewalk. Tulane Avenue is also wide, its neutral ground, however, being much narrower. Each avenue has two roadways separated by a neutral ground. The bus had left its terminal station, a few blocks from the scene of the accident and was on its way out Tulane Avenue going in a direction away from the Mississippi River, its destination being Baton Rouge.
The defendant Turner, in his Ford, was going up Claiborne Avenue. The plaintiff Esteve was driving on Tulane Avenue towards the Mississippi River, that is, in the direction opposite to that in which the bus was being operated. The semaphore traffic light at the intersection was operating automatically.
The bus on Tulane Avenue had crossed the first roadway of Claiborne Avenue, had traversed the width of the neutral ground of that avenue and had entered the second roadway of Claiborne Avenue. The Ford of Turner, which had entered the intersection at about the same time, collided with the bus in the intersection. The bus swerved or was knocked to its left, so that it then crossed the width of the rather narrow neutral ground of Tulane Avenue and also several feet of the other roadway of Tulane Avenue and then crashed into the left side of the car of the plaintiff, Esteve, who, as we have said, was going in the direction directly opposite to that in which the bus had been going before the first collision occurred.
Esteve sustained physical injury and his car was severely damaged. He then brought this suit, praying for solidary judgment against the bus company and Turner, and alleging that the accident had resulted from negligence on the part of both drivers in that “each was trying to beat the other across the intersection”, and in that “both vehicles were going at speeds in excess of 40 miles an hour.”
Turner answered, admitting the occurence of the accident, but averring that it had been caused solely by negligence of the operator of the bus in that the said operator drove it into the intersection at an excessive rate of speed and in the face of a red traffic light. He averred that he had brought his Ford to a stop before entering the intersection and had waited for the light to turn green which it had done, and that he had then entered and been struck by the bus which had approached at an excessive rate of speed.
The bus company admitted the occurrence of the accident but denied any negligence on the part of its bus operator, and averred that the accident had been caused solely by negligence of Turner whose car had either “no brakes, or insufficient brakes, had no lights burning,” and “was in bad condition, mechanically and otherwise.” This defendant also averred that the car of Turner was driven at an excessive rate of speed, and that it entered the intersection “on a red light, having failed to stop before entering the intersection as required.” The defendant bus company also averred that Turner had been drinking and “had remained up all night,” and that his “faculties and powers of observation were impaired * * *.”
The case was tried before a jury in the Civil District Court which rendered a verdict in favor of plaintiff in the sum of $4,000 against both defendants solidarily. This verdict was not unanimous; the vote being nine to three, and we shall comment on this verdict later. On this verdict judgment was rendered in favor of plaintiff against both defendants soli-darily.
The bus company appealed suspensively. Turner did not appeal, and plaintiff Esteve did not answer the appeal of the bus company.
Though, in its answer, the defendant Continental Southern Lines, Inc., after denying any negligence on the part of its bus operator and after charging that the accident had been caused solely by negligence of Turner, pleaded alternatively the contributory negligence of plaintiff himself, there is not one syllable of proof that Esteve was in any way at fault, and accordingly the only question which we shall consider and discuss is whether the operator of the bus of one of the defendants *406 and Turner, the other defendant, who was operating his Ford car, were both at fault, or whether the accident was caused by the sole negligence of one or the other of them.
There is no doubt at all as to the negligence of Turner. The record makes it abundantly clear that he was operating his car without lights. Nor is there any doubt that he entered the intersection at considerable speed in spite of the fact that it was obvious that the bus was entering, or was about to enter the same intersection at the same time. We pretermit for a moment a discussion of whether the traffic semaphore light was or was not favorable to Turner. Even if he had a favorable light he himself said that he entered the intersection without reducing its speed, though he saw the-bus and saw that it was entering the intersection at the same time.
We are also convinced that Turner was intoxicated at the time. He, of course, denies this, but the evidence on the subject is most convincing.
The important questions, however, are whether, in spite of fault on the part of Turner, the driver of the bus should have avoided the -collision with the Turner car, or whether he should have, avoided the ensuing collision with the Esteve car even if he could not avoid the first collision.
The first disputed question is whether the traffic light was favorable to the bus as it approached and entered the intersection. On this question the only evidence to the contrary is the statement of Turner to the . effect that the light was favorable to him and consequently it must have been unfavorable or red jo the bus.
Kenneth E. Beck, the operator of the bus, is most positive that the light was green or favorable to the bus as he approached the first intersection; that it remained favorable as he crossed that intersection and traversed the width of the neutral ground, and that it was still favorable as he entered the second intersection in which the collision occurred. The testimony of Beck is vehemently attacked and we shall later discuss the ground on which this attack is based.
There were several passengers in the bus, two of whom testified, both favorably to the bus company. Henry A. Williams was seated on the right side of the bus a few seats from the front. He said: “ * * * that was a green light.” His testimony on this point -could not be shaken. He later said:
“The only thing that I noted that we were on the green light. I saw the green light. I did see that.”
Francis Griffin, who lived on the opposite side of Claiborne Avenue a short distance from the intersection, says that he had gone out on the front porch of his home when he noticed the Turner car on the other side of Qaiborne Avenue approaching the intersection ; that it was running at a speed of “between 30 and 35 miles an hour,” that it did not stop at the Tulane Avenue intersection; that the lights of the Turner automobile were not burning and that the traffic light at the corner was red towards Turner. He added: “The bus had the green light.”
Even the plaintiff himself very obviously was of the opinion that the light facing the bus must have been green because he says that as he himself approached the intersection going in the opposite direction, the light facing him was green. It is true that he say's that he did not actually reach the intersection before the accident occurred, but the testimony indicates that he was just about to enter it, and he says that “he does not run red lights.” If the light facing him was green, so, also, must have been the light which faced the bus.
Shortly after the accident plaintiff Esteve made statements to two different persons— one to a police officer and one to a claim adjuster. In both of them he said: “The light was green, I g^iess.” He did not sign either statement, but did not question the fact that the statements set forth what he had actually said when the statements were made.
The testimony of the bus driver as to the semaphore light is attacked on the ground *407 that he stated that, as he approached it, he saw it change from red to amber or caution and then to green, whereas, so counsel for plaintiff contend, it is shown that such lights do not, when changing from red to green, show an intermediate amber light. It is true that this witness, Kenneth E. Beck, insists that the light which he was approaching did show red then amber, then green, and it is also true that Frank M. Hero, Jr., Associate Traffic Engineer of the City of New Orleans, stated that it would not be “a normal operation” for such a light to show an intermediate amber light in changing from red to green. This witness, however, did not testify as to this particular light, 'but merely made the general statement that such lights normally do not show the intermediate amber color in changing from red to green.
The testimony of Henry A. Williams, a passenger in the bus who said that the light was green, is attacked on the ground that he said the light was located overhead “right on top of the street, by the street light,” whereas it is shown that the light was not suspended from overhead wires but was on top of a column or pedestal on the neutral ground. We do not attach much significance to this slight error on the part of the witness Williams. He is positive that he saw the light and that it was green. It was certainly higher than the front end of the bus as it approached the light and his impression that it was suspended from overhead, though erroneous, is readily understood.
While there is some dispute as to whether there was sufficient daylight to have made headlights unnecessary, the plaintiff himself showed that they were necessary, for when asked: “Were you able to see without your headlights,” he answered: “Not very far.”
That the Turner car, was being operated without lights was amply proven. As a matter of fact, the photographs of the car, which were taken only a few hours after the occurrence, show that in all probability that car was.not even equipped with headlights, the photographs show two gaping holes, one on the front end of each fender where the lights should have been. However, if we are in error in our conclusion that the car was not even equipped with light fixtures, there is practically no contradiction of the testimony that the lights were not burning on that car as it approached the intersection, though, of course, Turner himself said that they were.
The operator of the bus said that .all of the vehicles which he saw at the time had headlights except “the car that hit the bus.”
Mrs. Bascom Ducote, one of the passengers who was seated on the side of the bus from which the Turner car approached, said:
“I was watching in the side * * *. I saw a car; it was going very fast without lights on.”
Francis Griffin, who lived nearby, said that he was positive that the Turner car was being operated without lights.
There is no evidence whatever that the speed of the bus was excessive. Beck says that he approached the intersection at a speed of about 22 miles per hour and that he had reduced that speed to about 11 miles or possibly a little more when the Turner car dashed into the intersection and into the right front of the bus.
It thus appears that the Turner car was being operated at an excessive speed without lights, by an intoxicated driver and that it entered the intersection without stopping and in the face of a red light, and that the bus driver was operating the bus at a reasonable speed and was guilty of no negligence, at least prior to the occurrence of the first collision. Obviously the' collision with the Turner car was not caused by negligence on the part of the bus operator.
It is' shown, however, that after the collision the bus swerved to its left, .crossed not .only the width of the narrow neutral ground of Tulane Avenue and several feet of the other roadway, but then crashed into the car of the plaintiff and then continued until it reached almost the property line on the upper side of Tulane Avenue. Such a course of the bus'would, if not explained, of course- create an impression of negli *408 gence on the part of the operator in failing to have it under such control as would permit of his bringing it to a stop before it struck plaintiff’s car. But the record shows that as a result of the first crash, the bus operator was knocked from his seat and that before he could regain his position and obtain control of the vehicle, the second accident had occurred. Beck, when asked what had happened after the first collision, said:
“Knocked me out of my seat into the step-well of the bus.”
One of the passengers, Mrs. Ducote, said:
“The bus driver being knocked off of his and we be twisted around, I dropped on my knee. Then the bus turned to the left side on Tulane, crossing the sidewalk and hit a car was close to a brick building then the bus driver was up and he got on the brake and he stopped the bus right there when he hit the car.”
Williams, another passenger, referring to the effect of the first collision on the operator of the bus, said:
“Well, he got knocked off the seat and in a hurry he got up as quickly as he could, I guess, in order to get control of the bus. In so doing, it catapulted across over by the garage. The bus was going straight and it just made that quick turn.”
Our conclusion is that there was no negligence in the operator of the bus in failing to bring it to a stop before it crashed into the plaintiff’s car.
The accident, of course, was most unfortunate and it is regrettable that the damages sustained by plaintiff obviously cannot be recovered from the person who was at fault, Turner, the other defendant who did not appeal, but in the emergency which was created by the fault of Turner, the bus operator, did all that he could to avoid the accident.
While it is true that there is much jurisprudence to the effect that, where only questions of fact are involved, great weight should be given to the verdict of a jury, still we cannot overlook the fact that here the verdict was not unanimous. As reported in the record it was nine to three. In Matthews v. New Orleans Terminal Co., La.App., 45 So.2d 547, 554, we said:
“The fact that the jury was divided (three members thereof having disagreed with the findings of the majority) is also a persuasive factor in the present case. * * * ”
Very recently the Supreme Court in Norman v. State, 227 La. 904, 80 So.2d 858, reversed a judgment based on a jury verdict, commenting on the fact that there had first been a mistrial and that there had then been a verdict in favor of the plaintiff by a nine to three vote. And we find it almost unnecessary to state that on many occasions appellate courts have reversed judgments based on unanimous verdicts, notably Kennedy v. Opdenweyer, 11 La.App. 532, 121 So. 636, 123 So. 906; Newsom v. Starnes, La.App., 142 So. 704; Brown v. Louisiana Ry. & Nav. Co., 147 La. 829, 86 So. 281, 282.
That it is the Constitutional duty of appellate courts “to consider questions of fact and exercise our own judgment thereon to some extent” is stated by the Supreme Court in Brown v. Louisiana Ry. & Nav. Co., supra, wherein the Court refused to approve the verdict of the jury, holding that the verdict itself indicated uncertainty on the part of the jurors.
In the case at bar we think it evident that the jury did not completely understand just what was meant when the District Judge advised them that they might bring in a verdict “in solido” against both defendants. When the foreman of the jury reported that a verdict had been reached, the jury was polled and it appeared that nine of the jurors had voted for the verdict and three against it. At this time one of the jurors made the following statement:
“ * * * My recollection is when you polled the jury there were nine to three in favor of that particular verdict, but as I remember, two others were in favor of only one, and voted in *409 favor of Continental Southern Lines. So, is that the correct ballot, nine to three?”
It is true that the Court then asked the jury whether there was any correction to be made and the foreman stated that the verdict was nine to three “against two defendants in solido.”
This colloquy seems to indicate that at least one of the jurors did not understand just what was meant by the words “in solido”. However, even if the verdict was correctly reported as nine to three, we think that it was manifestly an incorrect finding as no negligence was shown in the operator of the bus.
Accordingly, the judgment appealed from insofar as it runs against the defendant, Continental Southern Lines, Inc., is annulled, avoided and reversed and plaintiff’s suit as against the said Continental Southern Lines, Inc., is dismissed at his cost.
Reversed.