271 So.2d 353 (1972)
Winnie A. ALBRITTON, Plaintiff-Appellant,
v.
BOSSIER CITY HOSPITAL COMMISSION et al., Defendants-Appellees.
No. 11955.
Court of Appeal of Louisiana, Second Circuit.
November 28, 1972.
*354 James E. Franklin, Jr., Dan A. Spencer by James E. Franklin, Jr., Shreveport, for plaintiff-appellant.
Lunn, Irion, Switzer, Johnson & Salley by Charles W. Salley, Shreveport, for defendants-appellees.
Before AYRES, BOLIN and HALL, JJ.
BOLIN, Judge.
Mrs. Winnie A. Albritton sued Bossier City Hospital Commission and its insurers, Continental Casualty Company and Lloyd's of London, England, to recover damages for a broken right ankle allegedly caused by the negligence of defendant's personnel while plaintiff was being X-rayed in Bossier Hospital. Also named as defendant was Linda Gorman, who was the X-ray technician at the time of the incident which allegedly caused plaintiff's injuries. From judgment rejecting plaintiff's demands she has appealed. For reasons to be assigned herein the judgment is reversed.
Continental Casualty Company filed a motion for summary judgment on the ground its policy did not extend coverage and this motion was sustained. No appeal was taken from that judgment and Continental is not before this court.
The two principal specifications of error forming the basis of this appeal are: (1) the trial court erred in finding that plaintiff failed to prove the Bossier City Hospital Commission, its agents and employees and Linda Gorman were negligent in the particulars alleged in the original and supplemental petitions, and (2) in finding the evidence failed to show how the plaintiff's ankle was fractured.
It is apparent from the record, and is pointed out to us by counsel for appellant, that the trial judge decided the case some months after trial and without the benefit of the transcript of testimony. We shall, therefore, carefully examine his written opinion in the light of the transcript in order to determine if the findings of fact, as well as those of law, are supported by the testimony and the cases cited. [See Owens v. Felder (La.App.Orl. 1948) 35 So.2d 671; Barker v. Phoenix Insurance Company (La.App.2d Cir. 1969) 220 So.2d 720]
The facts which are not contradicted will be set forth first. Mrs. Albritton was *355 admitted to Bossier City General Hospital on the morning of December 22, 1969, suffering from severe abdominal pains. Her regular physician, a general practitioner, called in a surgeon for consultation and the same morning plaintiff was taken to X-ray in a wheelchair and an X-ray was taken. Medications for pain and nausea were prescribed and administered to Mrs. Albritton. Later the same day the doctor requisitioned further X-rays and plaintiff was taken by stretcher from her hospital bed to the X-ray room for two abdominal X-rays, one in a flat position and the other in an upright position.
Linda Gorman, the technician, testified she and the attendant who brought the patient in and J. J. Schwartz, the chief radiological technologist, moved plaintiff from the stretcher to the X-ray table. Schwartz and the attendant then left the room and Mrs. Gorman proceeded to take the "flat" picture; thereafter she attached the footboard to the table and raised the X-ray table. Although Linda could not say definitely how far she raised the table, she was certain it was more than 45 degrees but much less than 90 degrees. It was after she had raised the table and positioned plaintiff for the "erect" or upright X-ray and started back to the machine that she turned to look back and check on Mrs. Albritton's position. She observed the patient slumping and she immediately pushed her body against Mrs. Albritton and called for help. Schwartz and Synda Dillard, who were in adjoining rooms, answered the call and hurried to assist in placing plaintiff back on the table and Schwartz pushed the button which electrically returned the table to a position horizontal with the floor. Each of these witnesses testified that plaintiff slumped or slid down and her knees "kind of went outward and she just kind of bowed down . . . she just kind of slumped and her legs kind of bowed outward." It is not contended plaintiff actually fell from the table.
Linda testified that, although the patient did not make any outcry of pain at first, after she was placed on the stretcher she said, "You all let me fall. You hurt me, you let me fall." These complaints were corroborated by Schwartz who testified he tried to reassure Mrs. Albritton that she was all right.
Mrs. Ferguson, plaintiff's daughter, testified that when her mother was brought back to her hospital room she was complaining of pain. She stated further, "She told me that while she was in X-ray, they let her slip. And I asked her where she was hurting and she said it hurt in her right ankle. Said, look at it and see, and I looked at her ankle and I couldn't tell anything. . . ."
On the following day plaintiff had more abdominal X-rays and was operated on for a ruptured appendix on the 24th of December. The day after the operation, while plaintiff was in intensive care, she complained of her right ankle which was swollen and discolored. Immediately thereafter X-rays of her ankle and lower right leg were made and it was determined she was suffering from a fracture of the right ankle.
There is no testimony or other evidence of any other incident which might have caused plaintiff's broken ankle. Neither is there any contention that she was suffering from any ailment other than abdominal pain when she was admitted to the hospital. We find all the evidence, including the testimony of witnesses to the incident which occurred in the X-ray room, is not only consistent with a conclusion that plaintiff's ankle was broken at that time, but excludes any other reasonable hypothesis.
With regard to the issue of the negligence of Linda Gorman and other personnel and agents of the hospital, Mrs. Gorman testified she recalled making two sets of abdominal X-rays of Mrs. Albritton on December 22, 1969. We shall confine ourselves to examination of the events and circumstances surrounding the taking of *356 the second set of X-rays on that date since all the evidence concerns the "incident" which we have found was the cause of the broken ankle.
The technician stated the patient was brought to the X-ray room, either on a stretcher or wheelchair, by an orderly or attendant; that she, the attendant and Mr. Schwartz placed the 200 pound patient on the X-ray table; that the other two left and she took the first X-ray. She stated she was satisfied she needed no help since Mrs. Albritton seemed able to take in her breath and hold it for the length of time necessary to make the pictures. She then positioned the patient and rotated the table to enable her to make the "upright" abdominal picture but she did not use the straps which are provided on the table nor did she call anyone to aid her in holding up the patient. When questioned about her usual procedure she stated she knew how to use the straps but that she never used them except to strap a child or a person who was "out of his mind", or had been in an accident to assure the patient would remain in proper position while the technologist was making the X-ray. She was questioned about whether she knew Mrs. Albritton was sedated and she replied she never examined the chart nor did she ever try to make an independent examination of the patient except to ask the patient if she was all right and if she could hold her breath for the picture.
Dr. Carroll, director of the X-ray Technology School at Schumpert Memorial Hospital where Linda received her training, testified if a technologist knew a patient had been sedated then he or she would or should take special precautions as they had been taught to do. These precautions would be to call some one in to assist them, to hold the patient if needed, or to use the restraining bands that are provided on all X-ray machines. He stated further the restraining bands "won't keep them from falling but it will support them somewhat to keep them perhaps from hurting themselves." Questioned further concerning the proper procedure to be followed for the patient's safety he testified:
"Well, let me put it this way, about ninety percent of all of the accidents that happen in X-ray departments, involve the falling of the patient. This is something that we all are always very much aware of, and we try to keep the technologist very much aware of it and the orderlies and everybody who handles the patient. Now, any patient admitted on the stretcher, naturally, common sense would tell anyone that the patient would have to be handled with special care."
The general organization and policy manual of Bossier City General Hospital outlining the procedures, duties and individual responsibilities of personnel of the radiology department provides that patients should never be left in a position where they will be unobserved. If the patient is to be observed only occasionally it is the responsibility of the technician to see that the patient is secure. This manual also provides that the form for requisition of X-rays should contain, among other things, the examination requested, including a brief history and pertinent physical findings to be completed by the physician. The duties of a staff technician also include the use of a "variety of patient-supporting and restraining equipment and devices."
The standard of care to be exercised by hospital personnel in charge of a patient has been set forth in great detail in Favalora v. Aetna Casualty & Surety Company (La.App. 1st Cir. 1962) 144 So.2d 544 at 551, 552. That case involved injuries to a patient who fell while being X-rayed and the court observed:
". . . It would appear that even a superficial clinical history would be of considerable value to the radiologist and assisting technicians in determining, among other things, the patient's ability to stand without incident during such prolonged examination.
* * * * * *

*357 "In the case at bar we believe the failure of the radiologist to secure plaintiff's medical history prior to commencing the examinations was negligence constituting a proximate cause of the accident. Had such a history been taken it would (or should) have disclosed that one of the purposes of the examinations was to determine, if possible, the reason why plaintiff was subject to fainting. We have little doubt but that the disclosure of such information would have prompted an increased alertness on the part of the radiologist and technician involved herein."
Considering the condition of Mrs. Albritton when she was admitted and the medication which had been administered, it was incumbent upon all personnel in the hospital who attended her to exercise the highest standard of care in order to aid her recovery and to see that she was not subjected to any unnecessary danger or hazards aside from those inherently connected with the illness for which she was admitted.
We find Linda Gorman and the hospital, through its agents and employees, failed to exercise the high degree of care commensurate with the dangers involved and as a consequence are guilty of fault which was the cause of plaintiff's injury. Louisiana Civil Code Articles 2315, 2316, 2320. See Favalora v. Aetna Casualty and Surety Company, supra.
Mrs. Albritton, initially hospitalized for a ruptured appendix, underwent abdominal surgery and a recovery period of three weeks or more. It is not contended plaintiff was forced to remain in the hospital longer than she otherwise would because of the fracture. Even though the injury was discovered on December 25 or 26, it was considered inadvisable, because of excessive swelling, to put a cast on the broken ankle until January 7, 1970. This cast failed to harden and it was necessary to replace it two days later with a short leg cast with a walking heel. This cast was removed by Dr. Robinson on February 10, 1970 and an ace bandage applied. Mrs. Albritton was advised to ambulate with crutches. On March 19 she was, according to Dr. Rayburn, ambulatory without crutches. Thus it appears she was incapacitated at home for a period of nearly three months due to the injury to her ankle, during which time she could move around only with the aid of a walker or crutches. Furthermore, according to lay testimony, she suffered considerable pain and discomfort and has had to limit her activities. However, the medical testimony fails to support an award for permanent disability or for future medical expenses.
Plaintiff has sought damages for past, present and future pain and suffering, permanent injury to her leg and ankle, hospital, nursing, medical and drug expenses, both past and future. We think an award of $3,500 will adequately compensate plaintiff for her pain, suffering and inconvenience. It was stipulated the public liability policy issued by defendant, Lloyd's of London, contains a $7,500 deductible clause, excluding costs. We have only been able to determine from the evidence that plaintiff was charged $50 for treatment of her leg and ankle by Doctors Rayburn and Robinson; $19 for X-rays and $56 for use of the emergency room and application of the two casts. In addition we fix the fees of the expert witnesses, Doctors Rayburn, Martin, Fox and Carroll, at $100 each.
For the reasons assigned the judgment of the lower court is reversed, annulled and set aside and judgment is now rendered in favor of plaintiff, Winnie A. Albritton, and against defendants, Bossier City Hospital Commission and Linda Gorman, in solido, for $3,625 plus legal interest from date of judicial demand until paid. There is also judgment in favor of Winnie A. Albritton and against defendants, Bossier City Hospital Commission, Linda Gorman and Lloyd's of London, England, in solido, for all costs of these proceedings, including the fees of the expert witnesses.